UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Leah Wallace,
        Plaintiff

                                        Case No. 19-cv-1049-SM
        v.                              Opinion No. 2022 DNH 012

New Hampshire Ball Bearings, Inc.,
        Defendant


## O R D E R

Leah Wallace filed this suit against New Hampshire Ball Bearings, Inc., her former employer, asserting violations of the Americans with Disabilities Act ("ADA") and the New Hampshire Law Against Discrimination, N.H. Rev. Stat. Ann. 354-A, and a common law wrongful termination claim.  Defendant has moved for summary judgment.  Wallace objects.


## Standard of Review

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, a factual dispute "is 'genuine' if the evidence of

1

record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit." <u>Rando v. Leonard</u>, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted). Consequently, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." <u>Perez v. Lorraine Enters</u>., 769 F.3d 23, 29–30 (1st Cir. 2014).  In other words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment." <u>Tobin v. Fed. Express Corp.</u>, 775 F.3d 448, 451–52 (1st Cir. 2014).  <u>See</u> <u>generally</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

### **Factual Background**

The material facts, viewed in the light most favorable to Wallace, are as follows.  Leah Wallace suffers from a severe latex allergy.  She reacts to latex when she is "around it, handle[s] it, [or is] touched by it."  Def.'s Exh. 2, Wallace Dep. 50:17.  Exposure to latex causes her to develop a variety of symptoms, including: difficulty swallowing, hives, fever, swelling, difficulty breathing (or a complete inability to breath), and, potentially, anaphylaxis.  As a result of her

allergy, Wallace has sought emergency care, and has been
injected with an EpiPen, which is used to treat life-threatening
allergic reactions (anaphylaxis).

Wallace typically manages her allergy by carrying Benadryl,
an antihistamine medication, and an EpiPen with her at all
times.  She also "avoid[s] direct contact with latex," and keeps
"latex out of [her] immediate proximity."  Pl.'s Exh. 1 at ¶ 5.
Her past employers have accommodated her allergy by allowing her
to wear non-latex gloves (when gloves were required), or by
allowing another employee to perform tasks that involved latex
materials.  For example, when Wallace worked at a supermarket,
another employee would restock grocery shelves that contained
latex products.  And, when Wallace worked at a cleaning company,
her employer switched all employees from latex gloves to non-
latex gloves after learning of Wallace's allergy.

On October 21, 2018, Wallace submitted an application for
employment at New Hampshire Ball Bearings, Inc.  As part of her
application, Wallace included a "Voluntary Self-Identification
of Disability" form, but did not note that she had a disability.
That is because, Wallace says, she did not consider herself
"disabled:" she had "always done whatever is necessary to
accommodate [herself] and live as normal a life as possible."
Pl.'s Exh. 1 at ¶ 6.  After filing the application, Wallace was

contacted by Jennifer Dunleavy, who worked in NHBB's Human
Resources department, to schedule an interview.


On November 10, 2018, Wallace was interviewed by three NHBB
employees at its Laconia facility: Dunleavy; Phil Nichols,
Senior Manufacturing Supervisor at the Laconia facility; and
Kathy Moulton, Teflon Lead.  At the time, NHBB was hiring for
three positions: Teflon assembler, machinist, and grinder.
During her interview, Nichols gave Wallace a tour of the
facility.  Wallace informed Dunleavy and Nichols of her latex
allergy.  They responded that her allergy would not be a
problem, and that NHBB could accommodate Wallace by allowing her
to use non-latex gloves, and to carry her EpiPen on the factory
floor.  Following the interview, Moulton and Nichols both
recommended that she be hired.


Wallace was offered a position as a Teflon assembler, first
shift, entry level, at the NHBB Astro Division at $14.60 an
hour.  After a 90-day probationary period, Wallace would be
eligible for benefits, including health insurance, dental
insurance, life insurance, short-term disability, vacation pay,
and holiday pay.  Wallace accepted the position, although she
later conceded she was disappointed that she was not offered a

position as a machinist.[1]  See Def.'s Exh. 2, Wallace Dep. 178:18-20.


On December 10, 2018, Wallace, along with approximately 12 other new NHBB employees, began NHBB's 13-day orientation course.  Wallace participated in the first day of orientation, including a tour of the manufacturing facility.[2]  During the tour, she observed that several of the Teflon assemblers were wearing latex gloves in close proximity to each other.


Orientation continued on December 11, 2018.  After the morning training session, Dunleavy was assisting new employees with completing on-boarding paperwork when she was approached by Wallace.  Referencing her latex allergy, Wallace asked Dunleavy if she could be hired for the machinist position instead of the Teflon assembler position.  As Wallace later explained:

---

[1]     NHBB's machinist position commanded a higher pay grade, and required additional training and experience.  See Def.'s Exh. 5, Dunleavy Dep. 45:15-19 ("typically, [machinist] positions . . . are labor grade six, and she was hired for a labor grade four, so that was a couple of labor grades higher than the one she was hired for.").

[2]     Wallace also received a copy of the NHBB employee handbook, which requests that new employees notify human resources if accommodation is required to perform the essential functions of the position due to disability.  The handbook further notes that employees may be required to provide medical documentation regarding the disability, and regarding accommodations that may be effective. See Def.'s Exh. 2, Wallace Dep. 75:20-76:20.

| Q: | [W]hy were you asking to change from Teflon to machinist? |
|---|---|
| Wallace: | Just, like, the close proximity for, like, my allergy. There was only, like, three people in that machinist area and Teflon had like 20 people. |
| Q: | . . . When you say people, just being close proximity to people was your concern? |
| Wallace: | Just being [in] close proximity to people working with latex gloves. |

Def.'s Exh. 2, Wallace Dep. 80:7-15.  Wallace reasoned that, because there were fewer machinists than Teflon assemblers, if she worked as a machinist, fewer employees would need to switch to non-latex gloves to accommodate her allergy.[3]  Dunleavy agreed to speak with NHBB's Human Resources Manager, Nicole Parker, about Wallace's request, and, as promised, spoke with Parker later that day.

The next morning, Parker pulled Wallace out of orientation to discuss the request.  During that conversation, Wallace explained that her latex allergy was quite severe.  She told Parker that she had once suffered "a significant reaction in [a] . . . restaurant when another patron was sitting less than a foot from [her] at the bar counter while wearing latex Croc

---

[3]    Wallace says that, when she spoke with Dunleavy, she was unaware that the machinist position was a higher pay grade than the Teflon assembler position, and required additional experience.  Def.'s Exh. 2, Wallace Dep. 82:12-21.

shoes."  Pl's Exh. 1, ¶ 16.  Wallace told Parker that she was

requesting a transfer to the machinist position because she had

seen "many employees working in Teflon in close proximity to

each other wearing latex gloves," and she needed to "keep latex

out of . . . close proximity."  Id. at ¶ 17.


    Parker was (understandably) concerned.  See Def.'s Exh. 4,

Parker Dep. 32:15-20 ("Her story about being around Crocs at a

restaurant  . . . was very disconcerting to us, not really

understanding what that meant in a facility that has 500

employees, latex sneakers or shoes or whatever could be around

her.").  Wallace and Parker discussed prior accommodations made

by Wallace's former employers.  According to Wallace, she told

Parker that she was able to capably manage her latex allergy by

keeping latex "out of . . . close proximity and carrying

Benadryl and an EpiPen at all times."  Pl's Exh. 1, ¶ 18.  But,

based on the potential airborne nature of Wallace's allergy,

Parker was worried that those precautions would not be

sufficient to protect Wallace, and wanted to better understand

what Wallace meant by "close" proximity to latex.  See Def.'s

Exh. 4, Parker Dep.. 35:19-36:1 ("Space, you know, how close can

she be [to latex] . . . .  She said she could smell it.  Does

that mean she can't be around it at all?  We needed more

information on the scope of what her allergy was and how and

what accommodation her physician felt she would need to work

here.").  As Parker explained, "I was not comfortable.  My job is to provide a safe work environment for all employees, and not understanding what an airborne allergy could do to somebody was very unnerving."  Def.'s Exh. 4, Parker Dep. 53:17-20.

Parker reached out to NHBB's Plant Services Manager, Herbert Parkhurst,[4] to discuss sources of latex exposure in the NHBB facility, including building materials, manufacturing supplies, and coworkers' clothing (since Wallace told Parker about her reaction to Crocs at the restaurant bar).  Parker also emailed Patti Carrier, who served as NHBB's environmental manager in its Peterborough HiTech Division, and was assisting with the Laconia facility's safety program, for advice.  See Pl.'s Exh. 11.  Carrier responded that, because Wallace said that her latex allergy was airborne, Carrier "wasn't positive [NHBB] could keep her away from a potential exposure."  Id.  She mentioned that Peterborough had eliminated latex gloves from its facility, and suggested that the Laconia facility might do the same.  Both Parker and Carrier agreed that, before taking action, NHBB needed additional information from Wallace's physician concerning her allergy.

---

[4]    Parkhurst had spoken with Wallace earlier during orientation when she asked for permission to carry her EpiPen while working on the factory floor.  Parkhurst assured her that it would not be a problem.

Parker then met with Wallace again, and asked her to provide a note from her physician describing her allergy and its "parameters," so NHBB could determine whether or how she could be accommodated.  Def.'s Exh. 4, Parker Dep. 54:4-6.  Parker then sent Wallace home for the day.  Wallace immediately contacted her physician's office, and asked them to fax NHBB a note concerning her latex allergy.  Her physician's office promptly did so, faxing NHBB a letter that stated Wallace: "has a severe latex allergy which can result in anaphylaxis.  This is a serious reaction which would require immediate medical intervention."  Pl.'s Exh. 12.

Parker called Wallace after receiving the doctor's note. Parker explained to Wallace that the medical note was insufficient because it lacked detail, and did not adequately explain what accommodations would be sufficient so that Wallace could safely perform her job at NHBB.[5]  Def.'s Exh. 2, Wallace Dep. 105:11-14, 109:13-14.  Wallace promptly reached out again to her physician, requesting a more detailed letter.  However,

---

[5]    In her affidavit, Wallace states that Parker did not tell her what specific details NHBB required.  See Pl.'s Exh. 1 at ¶ 21.  But, her deposition testimony is to the contrary, as she testified that, during her December 12, 2018, phone call with Parker, Parker told her that NHBB required a note stating "how many feet" Wallace could be "within latex."  Def.'s Exh. 2, Wallace Dep. 105:11-14; 109:13-14.

her physician's office told her that they were unable to provide
a more detailed letter.

Wallace returned to orientation the next day, December 13,
2018, but was again pulled out of orientation to discuss her
latex allergy with Parkhurst and Parker.  As Parkhurst later
summarized:

> we talked about gloves, and I remember telling her
> that, you know, if, you know, your sensitivity is just,
> you know, latex gloves, that's very easy to just wear
> nitrile.  They're all over the place.  And then she
> brought up that she had had a reaction to someone's
> shoes at a restaurant, and for me that totally changed
> how we needed to view her, her issue because if she's -
> - if she has an airborne issue, you know, whether it's
> inhalation or aspiration, that's an entirely different
> animal to deal with than a glove that's on your hand
> with a skin contact, you know, because then you're
> talking about dosage and duration, and I needed to know
> a lot more specifics about how to protect her from that
> type of hazard.

Pl.'s Exh. 10, Parkhurst Dep. 24:19-25:11.  Parkhurt suggested
that the entire facility could be converted to non-latex gloves,
but noted that while "it could physically be done," he was
"concerned that if [Wallace] has a reaction to someone's shoes,
just changing out gloves isn't going to help."  Id. at 26:1-5.

Wallace told Parker and Parkhurst that her allergy could be
accommodated if she avoided latex, and by carrying her EpiPen
and Benadryl.  But, both Parker and Parkhurst felt that
additional medical information was necessary so that they could

best determine how to safely accommodate Wallace's allergy.  See
Def.'s Exh. 4, Parker Dep. 40:1-10 ("[Wallace] said that she had
a latex allergy.  She accepted the fact that Phil told her she
could wear nonlatex gloves, so we did initially accommodate her
based on her information.  She then changed it to 'I [have an]
airborne allergy,' which is very different than contact,
something we've never dealt with before, so we asked for further
medical information so that we could better understand what
accommodation she needed.").  Wallace was sent home again with
instructions that she should not return to work until she could
provide NHBB with more detailed medical information concerning
her allergy.[6]  See Pl.'s Exh. 2, Wallace Dep. 112:6-9.


    Wallace reached out again to her physician's office.  Her
doctor suggested that she visit an allergist, who might be able
to provide NHBB with the requested information.  Wallace called
to schedule an appointment with an allergist, but was informed
it might be several months before she was able to see the
doctor.  Wallace then called Parker and left her a voice
message.  She stated that she would not be able to visit the

---

[6]    Wallace's testimony is again inconsistent on that point.
In her affidavit, Wallace states that Parker failed to specify
what details were needed.  See Pl.'s Exh. 1 at ¶ 23.  But, at
deposition, Wallace testified that Parker and Parkhurst told her
"they wanted a more detailed doctor's note of how many feet
[she] could be within [latex]," and that she could not return
until she had obtained that note.  Def.'s Exh. 2, Wallace Dep.
112:6-9.

allergist for "some[]time," and so could not immediately provide
NHBB with the medical information requested.  Pl.'s Exh. 14.
Wallace stated that she was ready and willing to work at NHBB in
the meantime.

Accordingly, Wallace returned to orientation on December
17, 2018, hoping to work.  Parker met her in the lobby.  Wallace
again explained that she would not be able to get the medical
information NHBB required until her appointment with the
allergist, which, she stated again, might take some time.
Because Wallace had not provided the information that NHBB had
requested, Parker terminated Wallace's employment.  She told
Wallace that if she could obtain a more detailed medical note,
she should contact NHBB, and "we'll talk about a rehire."
Def.'s Exh. 4, Parker Dep. 61:16-18; Def.'s Exh. 2, Wallace Dep.
122:7-9.

On January 18, 2019, Wallace visited the allergist.  The
doctor told her to carry Benadryl and an EpiPen with her at all
times, and to keep latex products more than an arm's length away
from her.  The allergist provided Wallace with a note stating:
"Leah A Wallace is a 21 [year old] y.o. patient of mine with a

history of latex allergy.  I recommend avoiding latex in the workplace."[7]  Pl.'s Exh. 15.

Wallace filed a Charge of Discrimination with the New Hampshire Commission for Human Rights.  In March, 2019, defendant sent Wallace a letter offering reinstatement as a Teflon assembler based on the information set forth in Wallace's Charge that described her allergist's recommendation.  Wallace did not accept NHBB's offer.

## Discussion

Wallace contends that NHBB violated the Americans with Disabilities Act, and the New Hampshire Law Against Discrimination, N.H. Rev. Stat. Ann. 354-A, by (1) failing to accommodate her disability; (2) terminating her due to her disability; and (3) retaliating against her for requesting an accommodation.  Similarly, in support of her wrongful termination claim, Wallace alleges that NHBB terminated her employment in "bad faith, malice, and/or retaliation."  Compl. ¶ 40.  As mentioned, defendant moves for judgment on all of Wallace's claims.

---

[7]    In a January 18, 2019, letter to Wallace, Wallace's allergist wrote that she recommended "strict avoidance of latex."  Def.'s Exh. A.

## Count 1: Disability Discrimination

With regard to Wallace's claims alleging disability discrimination, our Court of Appeals has stated:

> The ADA provides 'a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 82 (1st Cir. 2008) (quoting Katz v. City Metal Co., 87 F.3d 26, 30 (1st Cir. 1996)). Indeed, "[t]he ADA was enacted to 'the elimination or reduction of physical and social structures that impede people with some present, past, or perceived impairments from contributing, according to their talents, to our Nation's social, economic and civil life....'" Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 186 (1st Cir. 2011) (quoting Tennessee v. Lane, 541 U.S. 509, 536 (2004) (Ginsburg, J., concurring)).

Ortiz-Martinez v. Fresenius Health Partners, PR, LLC, 853 F.3d 599, 604 (1st Cir. 2017).  "To establish a claim under the ADA, a plaintiff must prove three factors by a preponderance of the evidence: (1) she was disabled within the meaning of the ADA; (2) she was qualified to perform the essential functions of the job, either with or without reasonable accommodation; and (3) the employer took an adverse employment action against her because of the alleged disability." Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 32 (1st Cir. 2011) (citations omitted).[8]

---

[8]     "As . . . this court and the New Hampshire Supreme Court have recognized, claims under Section 354-A are construed in conformity with the ADA." Gage v. Rymes Heating Oils, Inc., No. 14-CV-480-PB, 2016 WL 843262, at *5 (D.N.H. Mar. 1, 2016) (Barbadoro, J.) (citing Montemerlo v. Goffstown Sch. Dist., SAU No. 19, No. 12-CV-13-PB, 2013 WL 5504141, at *5 (D.N.H. Oct. 4, 2013) (collecting cases).  Wallace's arguments concerning her

1.   <u>Wallace is an Individual with a "Disability."</u>

Defendant first argues that Wallace has not sufficiently established that she suffers from a disability within the meaning of the ADA.  The Act defines "disabled" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  "There is no per se rule about either the type or quantum of evidence that a plaintiff seeking to establish a disability must supply."  <u>Mancini v. City of Providence by & through Lombardi</u>, 909 F.3d 32, 39 (1st Cir. 2018) (citation omitted).


Defendant asserts that Wallace has not demonstrated that her latex allergy substantially limits major life activities. It argues that Wallace herself did not perceive her allergy as a

─────────────────

"Section 354-A claim rise and fall on the same bases as [her] ADA arguments," and so the court's analysis applies equally to Wallace's Section 354-A claim.  <u>Id</u>.

disability, as she marked that she was not disabled on her employment application.  And, defendant says, Wallace has stated that her latex allergy can be easily addressed simply by avoiding contact with latex, and that she has held numerous other jobs that required minimal accommodation.  So, defendant says, her allergy was not severe enough to limit a major life activity.

Wallace responds that her latex allergy limits life activities of breathing, swallowing, and body temperature regulation.  She points out that, in 2008, the ADA was amended to modify the Act's definition of "disability," see 42 U.S.C. § 12102, and, under the amended ADA, "[t]he definition of disability ... shall be construed in favor of broad coverage of individuals ... to the maximum extent permitted by the [Amendments]."  42 U.S.C. § 12102(4)(A).

The ADAAA provides that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  42 U.S.C. § 12102(4)(D).  "The determination of whether an impairment substantially limits a plaintiff's major life activities shall be made without regard to the ameliorative effects of mitigating measures such as" learned behavioral modifications.  Id. at § 12102(4)(E).

Wallace's primary care physician wrote that her latex
allergy is severe, and "can result in anaphylaxis.  This is a
serious reaction which would require immediate medical
intervention."  Pl.'s Exh. 12.  Thus, when triggered, Wallace's
allergy limits certain life activities, including her ability to
breath.  "Unobstructed breathing clearly qualifies as a major
life activity."  Lima v. Middlesex Sheriff's Office, et al., No.
CV 19-11372-RGS, 2020 WL 823088, at *5 (D. Mass. Feb. 19, 2020)
(citing Ramos-Echevarria, 659 F.3d at 187 (quoting 29 C.F.R. §
1630.2(i)).


Defendant relies heavily on Jimenez-Jimenez v. Int'l Hosp.
Grp., Inc./Casino del Sol, No. 15-1461 (SCC) 2017 WL 5905529
(D.P.R. Nov. 30, 2017), a case in which the plaintiff suffered
from an allergic condition triggered by some perfumes and
chemicals.  The Jimenez-Jimenez plaintiff's "reactions were not
necessarily immediate," but varied based on the scent and
strength, and, by moving away from the smell, plaintiff was able
to remedy the situation.  Id. at *4.  Critically, unlike
Wallace, plaintiff's allergy only manifested when exposed to an
allergen at work.  See id. at *9 ("we have found no evidence
that Jiménez' condition was triggered outside of his place of
employment.  Therefore, the plaintiff has not made a sufficient
showing that his condition rendered him disabled within the

meaning of the ADA.").  For that reason, defendant's reliance is misplaced.

Keeping in mind that "the primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA," 29 C.F.R. § 1630.1(c)(4), and taking the summary judgment record in the light most favorable to Wallace, as the court must, an informed juror could conclude that Wallace suffers from a disabling condition under the ADA. The court will, then, assume that plaintiff qualifies as "disabled" for summary judgment purposes.

> 2.  <u>NHBB Attempted to Accommodate Wallace's Disability</u>.

Wallace alleges that NHBB failed to provide her with reasonable accommodation under the ADA and N.H. Rev. Stat. Ann. 354-A. "Under the ADA an employer is required to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on [its] operation of the business.'"  <u>Ortiz-Martinez</u>, 853 F.3d at 604 (quoting 42 U.S.C. § 12112(b)(5)(A)) (further citations omitted).  "[P]laintiff bears the burden of proposing an accommodation that would enable him to perform his

job effectively and is, at least on the face of things,

reasonable."  Kvorjak v. Maine, 259 F.3d 48, 55 (1st Cir. 2001).

Defendant argues that Wallace has failed to produce

evidence upon which an informed jury could conclude that NHBB

unlawfully denied Wallace an accommodation.  The court agrees.

The evidence of record demonstrates that Wallace first

asked NHBB to accommodate her latex allergy by allowing her to

carry an EpiPen and Benadryl, and to wear non-latex gloves.

NHBB readily agreed to those reasonable requests, on multiple

occasions.  But, after she observed the Teflon assemblers

working in close proximity to each other, wearing latex gloves,

Wallace was concerned that her earlier requested accommodation

would not sufficiently protect her.  So, she asked NHBB for an

additional accommodation in the form of a job change (from

Teflon assembler to machinist), a job for which she had not been

hired, and for which she was neither trained nor had the

requisite experience.  In support of that accommodation request,

Wallace informed the company that she could not be in "close

proximity" to latex (but she did not describe what she meant by

"close proximity," and described a past allergic reaction

triggered by latex in a restaurant patron's shoes).  Based on

Wallace's statements, NHBB reasonably understood that the

accommodations she previously requested and to which NHBB had

agreed (carrying an EpiPen and Benadryl, and wearing non-latex
gloves) would not be sufficient to allow her to work effectively
as a Teflon assembler.

Notably, the company did not reject Wallace's request to
change jobs.  Instead, NHBB requested additional information so
that it could assess the feasibility of her request, and how the
company might best accommodate her disability.  See Pl.'s Exh.
10, Parkhurst Dep. 25:4-11 (" [I]f she has an airborne issue,
you know, whether it's inhalation or aspiration, that's an
entirely different animal to deal with than a glove that's on
your hand with a skin contact, you know, because then you're
talking about dosage and duration, and I needed to know a lot
more specifics about how to protect her from that type of
hazard.").  As defendant states: "NHBB needed to know how close
Wallace could safely be in proximity to latex to appropriately
evaluate the adequacy and reasonableness of an accommodation."
Def.'s Mot. for Summary Judgment at 14.  NHBB of course had no
interest in transferring Wallace to a machinist position if it
would not reasonably and adequately address the extent to which
her latex exposure needed to be limited or eliminated.  And,
Wallace's statements that she needed to keep latex out of her
"close proximity" gave NHBB little specificity regarding how far
Wallace needed to stay away from latex to avoid triggering an
allergic reaction.

Parker explained her thinking at the time:

Q:   And did you, ultimately, speak with Herb Parkhurst
     about what possibly you could do to accommodate Leah
     Wallace?

A.   I didn't talk to him about accommodating.  I talked
     about better understanding what the -- what he thought
     about an airborne allergen for latex and what that
     meant.  You know, is there latex in 500 employees'
     sneakers?  Is there latex in their hair bands?  Do we
     use latex paint on the walls?  I needed to better
     understand from our facility what we use for latex.

                         . . .

Q.   Okay.  And what do you recall Herb telling you?

A.   Herb didn't have an understanding either of the
     impact of, you know, these Crocs that she had an
     allergic reaction to.  You know, are they latex?
     Does that mean that -- you know, again, we have
     500 employees walking around.  Is there latex in
     their shoes?  He knows from the facilities that
     there's latex in the paint on the walls in some
     areas,  . . . neither one of us had a good
     understanding of what an airborne latex allergy
     meant. And, again, that is why we really needed
     Leah to get that clarification and
     recommendations from her physician.

Def.'s Exh. 4, Parker Dep. 54:7-55:12.

     E.E.O.C. Enforcement Guidance provides that an employer is

entitled to seek limited records sufficient to substantiate the

claimed disability and accommodation if the employee has

presented insufficient supporting documentation.  See Turcotte

v. Comcast Cable Commc'ns Mgmt., LLC, No. 17-CV-150-PB, 2019 WL

635409, at *12-13 (D.N.H. Feb. 14, 2019) (citing E.E.O.C.

Enforcement Guidance: <u>Disability-Related Inquiries and Medical</u>
<u>Examinations of Employees under the Americans with Disabilities</u>
<u>Act</u> (2000), 2000 WL 33407181 at *9).  <u>See</u> <u>also</u> <u>Badri v. Huron</u>
<u>Hosp.</u>, 691 F.Supp.2d 744, 763 (N.D. Ohio 2010) ("An employer is
not required to speculate as to the extent of an employee's
disability or the employee's need or desire for an
accommodation.  Defendants had the right to substantiate their
concerns before they considered accommodations.") (citations
omitted).  NHBB's request for additional medical information
regarding airborne triggering of latex allergies to determine an
appropriate accommodation for Wallace was reasonable, especially
given the company's lack of knowledge or expertise, generally,
and with respect to Wallace's latex allergy, specifically, as
well as the ambiguity of the information that Wallace had
provided, including her report of a prior latex reaction
triggered by a restaurant patron's footwear.

Again, the burden was on Wallace to establish that the
accommodation she was requesting (a different job) was both
reasonable,[9] and could be performed effectively with particular

---

[9]     While the ADA provides that reasonable accommodation may
include "reassignment to a vacant position," 42 U.S.C. §
12111(9)(B), "an employee must demonstrate that a vacant
position existed and that she was qualified for it."  <u>Turcotte</u>,
2019 WL 635409, at *6.

The record evidence does not show that Wallace made any
effort to establish she was qualified for the machinist position

and reasonable accommodation.  See Kvorjak, 259 F.3d at 55.
While NHBB agreed to accommodate Wallace's initial requests, her
request evolved substantially (an entirely new job), and, as
noted, the information she had provided to NHBB in support of
her request disclosed a disability of greater sensitivity then
initially suggested, and one that might very well have not been
easily accommodated by changing to non-latex gloves.  As
defendant argues, "a transfer to the machinist position did not
address the underlying issue, the extent to which latex exposure
had to be limited or eliminated, . . . which necessitated
further medical documentation."  Def.'s Mot. in Support of
Summary Judgment at 14.

    "[A]n employee cannot demand an accommodation and then fail
or refuse to provide the employer with information critical to
determining whether the accommodation is necessary and
reasonable."  Willingham v. Town of Stonington, 847 F. Supp. 2d
164, 189 (D. Me. 2012).  See also Templeton v. Neodata Servs.,
Inc., 162 F.3d 617, 619 (10th Cir. 1998) ("An employer cannot be
expected to propose reasonable accommodation absent critical

---

as an accommodation.  And, Wallace's briefing gives little
attention to the fact that she requested a transfer to the
machinist position; she characterizes that request as one for a
"position other than Teflon," pl.'s obj. to motion for summary
judgment at 5, but offers no evidence that she had the training,
skills, or experience to satisfy the machinist job's
requirements, or that she had some other job in mind.

information on the employee's medical condition and the
limitations it imposes."). Wallace does not dispute that she
did not provide NHBB with the medical information the company
needed to assess her request. She did not even provide NHBB
with a date certain on which she would provide the information.
Given these facts, Wallace's contention that NHBB failed to
engage in the interactive process is puzzling.

It is well-settled that an employee's accommodation request
may "create[] a duty on the part of the employer to engage in an
interactive process." E.E.O.C. v. Kohl's Dep't Stores, Inc.,
774 F.3d 127, 132 (1st Cir. 2014) (quotation omitted). That
process "involves an informal dialogue between the employee and
the employer in which the two parties discuss the issues
affecting the employee and potential reasonable accommodations
that might address those issues." Id. (citing 29 C.F.R. §
1630.2(o)(3)). As our court of appeals has instructed:

> [I]t is imperative that both the employer and the
> employee have a duty to engage in good faith, and that
> empty gestures on the part of the employer will not
> satisfy the good faith standard. If an employer
> engages in an interactive process with the employee,
> in good faith, for the purpose of discussing
> alternative reasonable accommodations, but the
> employee fails to cooperate in the process, then the
> employer cannot be held liable under the ADA for a
> failure to provide reasonable accommodations.

Id. at 132 (citations omitted). See also Turcotte, 2019 WL
635409, at *12 ("An employee who refuses to comply with an

employer's reasonable request for medical information pertaining
to her disability can be found to have obstructed the process.")
(citing <u>Beck v. Univ. of Wis. Bd. of Regents</u>, 75 F.3d 1130, 1136
(7th Cir. 1996) (affirming summary judgment for employer where
employee refused to sign medical records release form that
employer requested due to insufficient information about her
work restrictions); and <u>Templeton</u>, 162 F.3d at 618-19 (affirming
summary judgment for employer because employee refused to
authorize her physician to release medical information that
employer reasonably requested)).  The evidence here compels the
conclusion that it was Wallace who raised the specter of a
highly sensitive and dangerous allergic risk caused by latex "in
close proximity," even illustrating her vulnerability by
suggesting an airborne risk, but who failed to provide any
reliable medical information regarding the nature and extent of
her particular allergy, or the extent to which an employer
should insulate her from exposure to latex in the workplace.

Wallace also references a variety of accommodations that
NHBB purportedly failed to offer her, including transitioning
the entire facility to non-latex gloves.  She argues that,
although Wallace asked to transfer to the machinist position,
"NHBB could have simply offered to have the other Teflon
employees switch to nitrile gloves, could have transitioned to a
complete latex ban like [NHBB's] HiTech [facility] in

Peterborough, or could have developed another accommodation all
together."  Pl.'s Opp. to Motion for Summary Judgment at 20.
But, Wallace did not request any of those accommodations.  And,
all of those proposals would not address latex in a co-worker's
footwear, or clothing, or a myriad of other products.  NHBB was
entitled to request substantiating medical information from
which it could assess the scope of Wallace's allergy, and what
accommodations could be reasonably fashioned to effectively
provide her with a safe workplace.

Finally, Wallace argues that NHBB's subsequent offer to
rehire her supports her contention that defendant failed to
accommodate her disability.  She says that, because NHBB offered
to rehire her, "NHBB could have accommodated Ms. Wallace all
along," since Wallace "simply needed to keep latex out of her
immediate proximity, carry an EpiPen, and carry Benadryl."
Pl.'s Obj. to Mot. for Summary Judgment at 11-12.  But, NHBB
agreed to those accommodation requests while Wallace was
employed by NHBB.  It was only after Wallace disclosed that
those agreed-upon accommodations might be insufficient (since
she could not have latex in her "close proximity") that NHBB
asked her to provide medical information in support of her
request.

Wallace has not pointed to admissible evidence sufficient
to support a reasonable jury's conclusion that NHBB denied her
reasonable accommodations under the ADA or N.H. R.S.A. 354-A.


   3.   Wallace Was Not Terminated Due to her Disability.

   Wallace similarly fails to point to record evidence
sufficient to support a juror's conclusion that she was
terminated by NHBB as a result of her disability.  Wallace says
that it cannot be "genuinely disputed that NHBB would not have
terminated Ms. Wallace on December 17, 2018, but for her
disability disclosure and request for accommodation."  Pl.'s
Obj. to Mot. for Summary Judgment at 22.


   To the contrary, Wallace has not established that she is a
"qualified individual" within the meaning of the ADA.  She was
hired by NHBB as a Teflon assembler.  She promptly informed NHBB
that, in order to perform the job, she'd need to carry an
EpiPen, and wear non-latex gloves.  NHBB readily agreed.
Wallace then informed NHBB that those agreed-upon accommodations
would not be sufficient to allow her to safely perform that job;
that she needed to keep latex out of her "close proximity," and
could not do that as a Teflon assembler, so needed to work as a
machinist.  NHBB cannot be faulted for believing Wallace when
she said she could not safely perform the job of Teflon
assembler due to the close proximity of co-workers wearing latex

gloves (and perhaps footwear).  Nor can NHBB be faulted for
requesting more specific medical information in support of
Wallace's request, as set forth supra.  Because Wallace told
NHBB she could not safely perform the job for which she was
hired, and because she did not provide medical information
sufficient for NHBB to assess her request for accommodation,
NHBB terminated her employment.

The overriding problem with Wallace's argument is that she
suggested to NHBB that she could not perform the essential
functions of her job (Teflon assembler) because of her latex
allergy, and needed to switch to a machinist position.  In other
words, Wallace complains that she was terminated from a job that
she told the company she could not safely perform because of her
latex allergy.  When NHBB endeavored to determine how to
accommodate her so that she could perform the essential
functions of that job, or another, she was unable to provide
NHBB with the information requested.  Given that factual record,
a reasonable jury could not supportably find that Wallace
sufficiently established that she was qualified for the Teflon
assembler position, with or without a reasonable accommodation.
And, she made no such showing with respect to any other
available positions.  See Crowe v. Appalachian Stitching Co.,
LLC, No. 2021-0129, 2021 WL 6069200, at *3 (N.H. Dec. 23, 2021)
(plaintiff "was not a 'qualified individual' while she remained

unable to work") (citing <u>Peyton v. Fred's Stores of Arkansas,</u>
<u>Inc.</u>, 561 F.3d 900, 903 (8th Cir. 2009) ("it is axiomatic that a
person who cannot perform any of the functions of a job, with or
without reasonable accommodation, cannot, as a matter of law, be
considered 'otherwise qualified' under the ADA.")).

Even assuming, <u>arguendo</u>, that Wallace has sufficiently
established a prima facie case, to avoid summary judgment,
Wallace must also "show by a preponderance of the evidence that
[NHBB's] proffered reason" to discharge was "pretextual and that
the actual reason for the adverse employment action [was]
discriminatory." <u>Johnson v. Univ. of P.R.</u>, 714 F.3d 48, 54 (1st
Cir. 2013) (further citation omitted).

Wallace fails to point to admissible evidence tending to
show that NHBB's proffered reason for terminating her employment
(her failure to provide requested medical information) was
pretextual.  She argues that pretext may be inferred from the
fact that NHBB allowed her only a short period of time to obtain
the requested information, and rejected the physician's note
that she did submit.[10]  NHBB could perhaps have been more

---

[10]    Wallace also argues that NHBB's discrimination against her
was intentional and reckless.  She contends that Parker
concluded that she was not disabled because she had not checked
that box on NHBB's Self-Identification of Disability form.  That
argument is unconvincing, as she points to no evidence that

generous in the time allowed Wallace to obtain the information
requested, especially once she informed NHBB that she needed to
schedule an appointment with an allergist.  But, that NHBB's
timeline may have been short does not mean that it was
discriminatory.  See Acevedo-Parrilla v. Novartis Ex-Lax, Inc.,
696 F.3d 128, 140 (1st Cir. 2012) ("mere questions regarding the
employer's business judgment are insufficient to raise a triable
issue as to pretext") (citations omitted).  Testimony by Parker
and Parkhurst suggests that both were genuinely worried that
Wallace would not be safe at the NHBB facility.  See, e.g.,
Def.'s Exh. 4; Parker Dep. 32:1-4 ("I didn't feel like I could
provide her a safe work environment without understanding better
what it is that she needed."); Pl.'s Exh. 10; Parkhurst Dep.
25:9-11 ("I needed to know a lot more specifics about how to
protect her from that type of hazard.").  And, Wallace's
argument ignores that she did not provide NHBB with a date
certain by which she would likely be able to provide the
requested information (or even the date of her allergist
appointment).  Finally, Wallace's argument that NHBB should have
just allowed her to work (presumably as a Teflon assembler)
until she was able to obtain the requested information cannot be
squared with the factual record.  As mentioned supra, it was
Wallace who informed NHBB that she was unable to work safely as

---

Parker relied on Wallace's form in any way in making the
decision to terminate her.

a Teflon assembler with the previously agreed upon
accommodations.  The company cannot be faulted for taking her
statements seriously.

On this record, a reasonable jury could not plausibly infer
that discriminatory animus was a motivating factor in her
termination.  Defendant is entitled to judgment on plaintiff's
discrimination claim under the ADA and N.H. Rev. Stat. Ann.
Section 354-A.

### Count II: Retaliation

Wallace further claims that her request for accommodation
constituted protected conduct, and, as a result of her request,
her employment was terminated.  Therefore, she contends, NHBB
unlawfully retaliated against her in violation of the ADA and NH
RSA Section 354-A.

Pursuant to the ADA's retaliation provision, "[n]o person
shall discriminate against any individual because such
individual has opposed any act or practice made unlawful by this
chapter."  42 U.S.C. § 12203(a).[11]  "To establish a claim of

---

[11]    "The New Hampshire Supreme Court looks to and finds
'instructive' federal standards established under Title VII ...
in resolving retaliation claims under N.H. Rev. Stat. Ann. §
354-A."  Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 856 (1st
Cir. 2008) (quoting Madeja v. MPB Corp., 149 N.H. 371, 378-79
(2003)).  Accordingly, the court relies on cases interpreting

retaliation, a plaintiff must show that (1) she engaged in protected conduct, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse employment action." Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 106 (1st Cir. 2007) (citations omitted).

Wallace of course engaged in protected activity by seeking accommodation for her disability. See Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 35 (1st Cir. 2010). Her contention that she would not have been terminated had she not requested an accommodation, however, is not supported by the evidence of record.

"Once a plaintiff makes out a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision." Carreras, 596 F.3d at 36 (quotations and citations omitted). "If the employer produces a legitimate reason for its decision, the burden under McDonnell Douglas shifts back to the plaintiff to show that the motive was discriminatory [or retaliatory]." Id. (quotations and citations omitted). "Thus,

---

the ADA to assess Wallace's retaliation claim under N.H. Rev. Stat. Ann. Section 354-A as well.

the plaintiff bears the ultimate burden to create a plausible inference that the employer had a retaliatory motive."  Id. (citing Benoit v. Technical Mfg. Corp., 331 F.3d 166, 174 (1st Cir. 2003)).

Defendant has responded that Wallace was terminated because she failed to provide necessary information for NHBB to determine whether it could provide her with a safe working environment.  Thus, even assuming that Wallace has adequately established a prima facie case of retaliation, she must also establish that NHBB's stated reason for terminating her employment was pretextual.  As set forth above, she fails to muster evidence sufficient to do so.  Instead, the evidence reveals that Wallace was terminated because she informed NHBB she could not safely perform the job for which she was hired, and failed to provide the medical information NHBB requested in order to assess what reasonable accommodation might be available to allow her to safely perform the job she was hired to do. Wallace also has not pointed to any evidence that suggests that NHBB harbored any retaliatory animus based on her requests for accommodation.  Indeed, the evidence is to the contrary: NHBB readily granted several of her initial accommodation requests before asking for additional medical information after Wallace informed the company that she could not have latex in her vicinity.

Accordingly, no reasonable jury, on the record, could conclude that Wallace was terminated because she requested an accommodation.  NHBB is entitled to summary judgment on Wallace's retaliation claim.

### Count III: Wrongful Discharge

For similar reasons, NHBB is entitled to judgment on Wallace's wrongful discharge claim.  A plaintiff claiming wrongful termination under New Hampshire law must establish: (1) her termination was motivated by bad faith, retaliation or malice; and (2) she was terminated for performing an act that public policy would encourage or for refusing to do something that public policy would condemn.  Lacasse v. Spaulding Youth Ctr., 154 N.H. 246, 248 (2006).  Wallace alleges that because she was terminated six days after she took an action that public policy would encourage (requesting accommodation for her disability), a jury could find that she was wrongfully terminated.

The factual record does not support Wallace's position.  Temporal proximity between action and reaction, alone, is not enough.  The evidence shows that Wallace was terminated not because she requested an accommodation (which was initially readily granted), but because she did not provide the medical

34

information necessary for NHBB to access her evolving accommodation request, and because she informed the company that she could not safely perform the job for which she was hired. Wallace also fails to point to evidence that might support a finding that her termination was motivated by bad faith, retaliation, or malice.

Accordingly, defendant is entitled to judgment on plaintiff's common law claim for wrongful termination.

## Conclusion

For the foregoing reasons, as well as those set forth in defendant's memoranda, defendant's motion for summary judgment (docket no. 16) is granted.  The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

January 31, 2022

cc:  Counsel of Record